PEDRO ROSARIO,

     Plaintiff,

     v.                                 **Case No. 18-CV-1878**

ANDREW M. SAUL,
Commissioner of Social Security,

     Defendant.

---

## DECISION AND ORDER

Pedro Rosario seeks judicial review of the final decision of the Commissioner of the Social Security Administration (SSA) denying his claim for supplemental security income under the Social Security Act, 42 U.S.C. § 405(g). Because the ALJ failed to support his decision with substantial evidence or to properly assess the record in light of Rosario's primary impairment of bipolar disorder, the decision will be reversed and remanded for expedited proceedings consistent with this decision pursuant to 42 U.S.C. § 405(g), sentence four.

## PROCEDURAL HISTORY

On April 3, 2012, Rosario filed applications for disability income benefits ("DIB") and supplemental security income ("SSI") alleging disability with a date of onset of May 1, 2006 due to bipolar disorder and other impairments. (Tr. 247–59.) The applications were denied initially and on reconsideration. (Tr. 144–98.) Rosario requested a hearing before an Administrative Law Judge ("ALJ"), which was held on December 16, 2014 before ALJ Jordan Garelick. (Tr. 45–93.) ALJ Garelick issued a decision finding Rosario not disabled on March 11, 2015. (Tr. 22–39.) The Appeals Council denied Rosario's request for review on

July 28, 2016. (Tr. 4–10.) Rosario appealed to the U.S. District Court for the Eastern District of Wisconsin. (Tr. 723–24.) On March 1, 2017, pursuant to a stipulation of the parties, U.S. Magistrate Judge David E. Jones reversed the decision and remanded for further proceedings. *Rosario v. Colvin*, No. 16-CV-1168 (E.D. Wis.), ECF No. 18. (Tr. 679–80.)

On remand, the Appeals Council vacated the decision and remanded to an ALJ with specific instructions. (Tr. 686–88.) The Appeals Council explained that the decision had failed to contain sufficient rationale with specific references to the record in support of the assessed limitations, failed to include a social limitation in the RFC despite finding mild difficulties in maintaining social functioning, and failed to provide sufficient rationale for rejecting the social limitations found in the State Agency opinions or for giving little weight to the opinion of Rosario's counselor, Sheila Bowman. (Tr. 686–87.) The Appeals Council also explained that the decision had relied on one statement by Rosario to a consultative psychologist that he got along with others, but did not acknowledge that Rosario also stated that he had problems with irritability or that the psychologist concluded that Rosario's mood variability had significantly affected Rosario's interpersonal relationships. (Tr. 687.) Finally, the Appeals Council criticized the decision for finding the consulting psychologist's opinion more reliable than Bowman's opinions without considering Bowman's specialty and the length and frequency of her relationship with Rosario: she had treated Rosario weekly for three months prior to issuing her opinions. (*Id.*) The Appeals Council instructed the ALJ on remand to give further consideration to non-treating and other medical source opinions and explain the weight given to each, give further consideration to Rosario's maximum RFC, and provide appropriate rationale with specific references to evidence in the record. (*Id.*)

On remand, Rosario abandoned his DIB claim and amended his alleged onset date to March 22, 2012. (Tr. 952.) The amended application for SSI benefits was denied in June 2017 and upon reconsideration in October 2017. (Tr. 837–57.) Rosario testified at a hearing before ALJ Jeffrey Gauthier on November 17, 2017, as did a vocational expert, Carly N. Coughlin. (Tr. 576–638.)

In a decision issued February 26, 2018, ALJ Gauthier ("the ALJ") found that Rosario had the severe impairments of obesity, neuropathy, and bipolar disorder. (Tr. 548.) The ALJ also found that Rosario had the non-severe impairments of obstructive sleep apnea, diabetes mellitus, hypertension, gastroesophageal reflux disease (GERD), grade one diastolic dysfunction, chronic lymphedema, knocked-knee, flatfoot deformity, and muscular strain of the back. (*Id.*) The ALJ found that Rosario did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1 (the "listings"). (Tr. 549–51.) The ALJ found that Rosario had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 416.967(b) except he can occasionally climb ramps and stairs; he can never climb ladders, ropes or scaffolds; he can never work at unprotected heights or around moving mechanical parts; he can never operate a motor vehicle in the workplace; he can perform simple, routine, and repetitive tasks but not at a production rate pace (e.g., no assembly line work); he can make simple work-related decisions; he can interact with supervisors no more than frequently and he can interact with coworkers and the public no more than occasionally; and he can tolerate occasional changes in a routine work setting. (Tr. 551.)

The ALJ found that considering Rosario's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that he can perform.

(*Id.*) Therefore, the ALJ found Rosario not disabled. (Tr. 565.) The ALJ's decision became the Commissioner's final decision when the Appeals Council denied Rosario's request for review on November 9, 2018. (Tr. 520–24.) Rosario appealed the decision to this court on November 29, 2018. (Docket # 1.)

## APPLICABLE LEGAL STANDARDS

The Commissioner's final decision will be upheld if the ALJ applied the correct legal standards and supported his decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is not conclusive evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (internal quotation and citation omitted). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811. The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

# ANALYSIS

Rosario argues that the ALJ erred in assigning little weight to the opinions of Rosario's treating providers, discounting Rosario's alleged symptoms, and failing to account for Rosario's social limitations in the RFC. (Docket # 14.) The Commissioner responds that the ALJ's decision is supported by substantial evidence and should be upheld. (Docket # 18.) I will address each argument in turn.

*1.    Treating Source Statements*

Rosario asserts that the ALJ improperly gave little weight to the opinions of his treating therapist and a treating nurse practitioner. (Docket # 14 at 8–18.) I agree.

An ALJ must consider all medical opinions in the record, but the method of evaluation varies depending on the source. Under SSR 06-3p, in place at the time Rosario filed his application, only opinions from "acceptable medical sources" are entitled to controlling weight. Information from "other sources," including therapists and nurse practitioners, is not entitled to controlling weight. Nevertheless, the opinions of other sources must be considered and should be evaluated on key issues such as the severity of a claimant's impairment and how it affects the individual's ability to function. In deciding what weight to give a treating therapist or nurse practitioner's opinion, the ALJ considers factors such as the treatment relationship between the individual and a treating source, including its length, nature, and extent as well as frequency of examination; and how consistent the medical opinion is with the record as a whole.

In this case, the record contains seven treating source statements: five from Rosario's regular psychotherapy provider, Sheila Bowman, MS (Tr. 509–11, 512–15, 1030–33, 1219–

23, 1739–40), and two from his treating nurse practitioner Staci O'Dell, APNP (Tr. 1027–28, 1076–80). All the statements opine to limitations more severe than those found by the ALJ.

### 1.1.  Sheila Bowman

Bowman provided psychotherapy to Rosario once or twice per week from October 2012 onward, and the record contains dozens of treatment notes documenting her sessions with Rosario. Between 2013 and 2017, Bowman submitted five treating source statements for Rosario's application for benefits. (Tr. 509–11, 512–15, 1030–33, 1219–23, 1739–40.) The ALJ summarized all five of these statements in his decision (Tr. 560–61), but explained that he gave them little weight because he found them inconsistent with other medical evidence, including Bowman's treatment notes and mental status exams by O'Dell and the consultative examiner showing mostly unremarkable cognitive measures. (Tr. 561.) The ALJ also discounted the opinions as based at least in part on subjective reports from Rosario. (*Id.*) Finally, the ALJ rejected Bowman's opinions about decompensation, absenteeism, fatigue, off-task behavior, and the need for extra supervision because he believed the record demonstrated "adequate functioning during a number of examinations," Rosario's "mood was stable when he followed the medication regimen," "he had no issues with sleep, and he was not tired in the morning," and Bowman's assessments were based on subjective reporting and were potentially "speculative in nature." (Tr. 562.)

### 1.2.  Staci O'Dell

Staci O'Dell, APNP, saw Rosario approximately every two months from January 2015 onward for medication management of his mental health symptoms. She submitted treating source statements in 2016 and 2017. (Tr. 1027–28, 1076–80.) Like Bowman, O'Dell opined to symptoms and limitations more severe than those found by the ALJ. In explaining

the little weight given to O'Dell's statements, the ALJ explained that the statements were inconsistent with O'Dell's treatment records. (Tr. 563.) The ALJ characterized O'Dell's treatment notes as documenting "some good function" and pointed to some specific notes for support. (*Id.*) The ALJ also explained that O'Dell did not adequately support her opinions with clinical findings or objective evidence. (*Id.*)

### 1.3.    Consistency

The ALJ discounted both providers' opinions on the basis that they were not consistent with treatment notes and mental status exams showing some adequate functioning. The ALJ's finding of inconsistency is patently wrong because the ALJ (1) relied on cherry-picked evidence, (2) failed to account for characteristic fluctuations in symptoms and the difference between the treatment context and full-time work, (3) improperly discounted opinions as based on subjective rather than objective evidence, and (4) erroneously interpreted Rosario's response to medication. Accordingly, there is no logical bridge between the evidence and the ALJ's conclusion that Rosario's impairments were not as severe as his providers opined.

### 1.3.1.    *Cherry-Picked Evidence*

The ALJ's finding that the restrictions Bowman and O'Dell opined to were inconsistent with treatment records reflects an improperly skewed evaluation of the evidence. For example, the ALJ discounted O'Dell's opinions on the basis that treatment records show "some good function," "stable" mood, and lack of fatigue. (Tr. 563.) This is a selective reading of O'Dell's treatment records, which alongside some good function show unmistakably impaired function.

In 2015, O'Dell prescribed Abilify for "psychosis and mood instability" and Latuda in increasing dosages for "bipolar depression." (Tr. 1017–22, 516–19.) O'Dell noted that Rosario

reported mood disturbances, hallucinations, talking to himself, fatigue and sluggishness, and poor sleep. (*Id.*) O'Dell frequently observed that Rosario appeared to have a low mood with a "concerned" or "tearful" affect and assessed a slight response to the medication. (*Id.*)

Treatment notes in 2016 indicate some improvement but continued impairment including mood fluctuations especially in response to stressors, sleep problems, and observations of poor hygiene. (Tr. 1059–67.) As for the "stable" mood O'Dell supposedly opined to in May 2016, the treatment note actually states that on an increased dosage of Latuda, Rosario's "[m]ood is more stable but still fluctuating. More awareness of hallucinations, less intense but still occurring." (Tr. 1067.) This is not evidence of a "stable" mood, but of an unstable one.

In early 2017, O'Dell noted that Rosario experienced a period of decompensation after a slight decrease in his dosage of Abilify, resulting in missed medication, missed appointments, "non-stop talking to people that are not there," and poor sleep. (Tr. 1181.) O'Dell reported that Rosario's clothing was soiled and he was "repetitive several times" during the appointment. (*Id.*) O'Dell assessed him as having decompensation and an increase in disorganized behavior associated with the decrease in Abilify and adjusted the medication accordingly. (Tr. 1182.)

The ALJ's decision to discount the providers' opinions on the basis of a cherry-picked record that downplayed voluminous evidence of dysfunction is erroneous and justifies reversal. *See Bryon K. R. v. Commissioner of Social Security*, No. 17-cv-477-JPG-CJP, 2018 WL 2463663, at *5 (S.D. Ill. June 1, 2018) ("[T]he ALJ erred in selectively considering the evidence of his mental health treatment. His discussion of that treatment downplayed the severity of his symptoms and highlighted the positive."); *Tremaine v. Berryhill*, No. 1:16-cv-

01268-TWP-DML, 2018 WL 1556172, at *8–9 (S.D. Ind. Mar. 30, 2018) ("An ALJ is not permitted to 'cherry-pick' from the mixed results in the medical records to support a denial of benefits.").

### 1.3.2.  Bipolar Disorder

Relatedly, the ALJ found inconsistencies between the severe limitations opined by the providers and instances of good functioning in the records, without exploring the obvious alternative explanation for the discrepancy: Rosario's bipolar disorder, which is by definition characterized by fluctuating symptoms. As the Seventh Circuit has explained:

> A person suffering from [bipolar] disorder has violent mood swings, the extremes of which are mania—a state of high excitement in which he loses contact with reality and exhibits bizarre behavior—and clinical depression, in which he has great difficulty sleeping or concentrating, has suicidal thoughts and may actually attempt suicide. The condition, which varies in its severity, is treatable by antipsychotic drugs and other medications. But many patients do not respond well to treatment, or have frequent relapses. For many patients, the prognosis of bipolar disorder is not good, as the disorder is associated with frequent relapses and recurrences.

*Bauer v. Astrue*, 532 F.3d 606, 607 (7th Cir. 2008) (internal quotations and citations omitted); *see also Jelinek v. Astrue*, 662 at 814 ("[W]e have often observed that bipolar disorder . . . is by nature episodic and admits to regular fluctuations even under proper treatment."); *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) ("The very nature of bipolar disorder is that people with the disease experience fluctuations in their symptoms . . . ."). Seventh Circuit case law cautions ALJs not to discount allegations of severe impairments on the basis that treatment notes indicate good function without accounting for the fluctuations inherent in the disorder. *See Kangail v. Barnhart*, 454 F.3d 627, 629 (7th Cir. 2006) ("[The ALJ] thought the medical witnesses had contradicted themselves when they said the plaintiff's mental illness was severe yet observed that she was behaving pretty normally during her office visits. There was no

contradiction; bipolar disorder is episodic."); *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) (because a claimant with bipolar disorder will have good days and bad days, "a snapshot of any single moment says little about [their] overall condition"); *see also Williams v. Colvin*, No. 15 C 7011, 2016 WL 6248181, at *12 (N.D. Ill. Oct. 25, 2016) ("[T]he ALJ should have considered the effect that [bipolar disorder's] fluctuating nature had on Plaintiff's depressive episodes instead of relying on one treatment note to find [inconsistency]."); *Jones v. Colvin*, 1 F. Supp. 3d 874, 877–78 (N.D. Ind. Feb. 19, 2014) (treatment notes stating that patient was euthymic, stable, and non-anxious were not adequate reason for rejecting treating provider's opinion when the record also showed that claimant at times had poor energy, frequent crying spells, irritability and weepiness, and talked to himself and heard voices).

In this case, the ALJ found that Rosario had the severe impairment of bipolar disorder. (Tr. 548.) However, the ALJ failed to account for the erratic nature of bipolar disorder in his evaluation of the evidence. (Tr. 549–564.) The ALJ made the same mistake as the ALJ in *Bauer*, which the Seventh Circuit critiqued as follows:

> Many of the reasons offered by the administrative law judge for discounting the evidence of [treating sources] suggest a lack of acquaintance with bipolar disorder. For example, the judge noted that the plaintiff dresses appropriately, shops for food, prepares meals and performs other household chores, is an "active participant [sic] in group therapy," is "independent in her personal hygiene," and takes care of her 13-year-old son. This is just to say that the plaintiff is not a raving maniac who needs to be locked up. She is heavily medicated, and this enables her to cope with the challenges of daily living, and would doubtless enable her to work on some days. But the administrative law judge disregarded uncontradicted evidence that the plaintiff's son cooks most meals, washes the dishes, does the laundry, and helps with the grocery shopping. And [treating sources], having treated the plaintiff continuously for three years, have concluded that she cannot hold down a full-time job.
>
> What seems to have made the biggest impression on the administrative law judge, but suggests a lack of understanding of bipolar disorder, was that Dr. Caspary's treatment notes, which back up the report in which she concludes that the plaintiff cannot work full time, contain a number of hopeful remarks.

They are either remarks the plaintiff made to Caspary during office visits or Caspary's independent observations—the plaintiff's memory was "ok," her sleep fair, she was doing "fairly well," her "reported level of function was found to have improved," she had "a brighter affect and increased energy," she "was doing quite well." On the basis of such remarks the administrative law judge concluded: "little weight is given the assessment of Dr. Caspary."

A person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days; that is true of the plaintiff in this case. Suppose that half the time she is well enough that she could work, and half the time she is not. Then she could not hold down a full-time job. *E.g., Watson v. Barnhart*, 288 F.3d 212, 217–18 (5th Cir. 2002); *Washington v. Shalala*, 37 F.3d 1437, 1442–43 (10th Cir. 1994). That is likely to be the situation of a person who has bipolar disorder that responds erratically to treatment. Ronald C. Kessler et al., "The Prevalence and Effects of Mood Disorders on Work Performance in a Nationally Representative Sample of U.S. Workers," 163 Am. J. Psychiatry 1561–68 (2006). That is another point that the administrative law judge overlooked.

*Bauer*, 532 F.3d at 608–09.

The need to evaluate Rosario's symptoms in light of the erratic nature of bipolar disorder was abundantly clear in this case. Beyond the diagnosis itself, both providers explained in their treating source statements that Rosario suffers from fluctuating symptoms. In a 2013 statement, Bowman explained that Rosario experienced "random episodes of psychosis which appear to happen with manic states." (Tr. 509.) She stated that Rosario "has the capability to interact appropriately . . . when mood is stable and thoughts are logical; however when mood fluctuates and client experiences psychosis, client has extremely difficult time interacting with others." (Tr. 510.) She also noted that "[e]xtreme lows/loss of energy greatly affect work output & work quality. Extreme highs also greatly affect work quality." (*Id.*) Bowman reported that Rosario's "mood appears to change from restless & talkative to appearing depressed and fatigued." (Tr. 512.) She checked a box indicating bipolar syndrome with a history of episodic manic/depressive symptoms, and included a handwritten note clarifying that Rosario became hyperactive when manic. (Tr. 513.) Bowman gave specific

examples from therapy when she had observed Rosario's mood swings. (*Id.*) O'Dell also described Rosario's variability in her treating source statements, stating, "Bad days are frequent. Pt misses appointments when not doing well" and "Pt becomes disorganized, experiences mood changes, talks to himself and wanders off." (Tr. 1077.) The treatment notes from both providers, Adult Function Reports, and Rosario's testimony at the hearing all extensively document fluctuations in mood.

Relatedly, the ALJ failed to appreciate that individuals with mental impairments may function well in certain supportive situations (such as therapy, presumably), yet function poorly in other contexts such as the workplace:

> Individuals with mental disorders often adopt a highly restricted and/or inflexible lifestyle within which they appear to function well. Good mental health services and care may enable chronic patients to function adequately in the community by lowering psychological pressures, by medication, and by support from services such as outpatient facilities, day care programs, social work programs and similar assistance.
>
> . . .
>
> . . . The mentally impaired may cease to function effectively when facing such demands as getting to work regularly, having their performance supervised, and remaining in the workplace for a full day.

SSR 85-15. *See Carradine v. Barnhart*, 360 F.3d 751, 755–56 (7th Cir. 2004) (ALJ failed to consider the difference between sporadic good function and the ability to work full time); *Edwards v. Colvin*, No. 14 CV 1345, 2016 WL 1271049, at *5 (N.D. Ill. Mar. 29, 2016) (ALJ erroneously found claimant's good orientation during mental examinations inconsistent with severe limitations).

The record in this case contains copious evidence of the maladaptive behavior described in SSR 85-15. In a 2013 treating source statement, Bowman checked boxes indicating, among other things, deeply ingrained maladaptive patterns of behavior. (Tr. 513.)

Bowman explained that medication reportedly helped stabilize Rosario's mood, but only until a stressor occurred. (*Id.*) In 2016, Bowman indicated that Rosario experienced maladaptive behavior such that symptoms may be reduced and he may be relatively stable without exposure to stressors, but would worsen if placed in even routine, simple work on a full-time basis. (Tr. 1030.) Bowman also stated that according to her observations, "when environmental stressors increase, Pedro's depersonalization experiences appear to increase during sessions." (Tr. 1033.) In 2017, Bowman again opined that Rosario would experience decompensation with even slight changes in environment, and had a minimal capacity to adapt to changes in his environment or current daily life. (Tr. 1219–23.) Bowman's opinions about Rosario's maladaptive behavior are amply supported by evidence in the record. At the hearing, Rosario stated that his ability to handle stress depends on "how stable" he is and his ability to cope with changes in routine is poor. (Tr. 302.) He stated that he has lost a job in the past due to his condition because he can't keep himself "stable." (Tr. 304.) Rosario's mother and brother-in-law also filled out Adult Function Reports indicating that Rosario has poor handling of stress and changes in routine. (Tr. 335–53.) Both Bowman's and O'Dell's treatment notes document Rosario's mood fluctuations in response to stressors.

When dealing with an inherently variable mental disorder, discounting the severity of symptoms on the basis that a claimant functions well on some measures at appointments or on brief mental status exams is illogical. It is also contrary to regulations, which recognize that symptoms "may vary in their intensity, persistence, and functional effects" and therefore direct ALJs to review the record to identify possible explanations for seeming inconsistencies. SSR 96-7p (superseded by SSR 16-3p (Mar. 16, 2016)); *Fischer*, 760 F. App'x at 477 (ALJ

improperly focused exclusively on claimant's "good days" when providers opined that she was likely to have good days and bad days). The ALJ failed to do so here.

The AJL's failure to evaluate the record in light of Rosario's primary diagnosis of bipolar disorder resulted in discounting his treating providers' opinions on an erroneous basis. This is reason enough for reversal.

### 1.3.3. Objective v. Subjective Evidence

The ALJ also faulted the opinions of both Bowman and O'Dell for lacking support from "clinical findings" or "objective evidence," being based on Rosario's self-reporting, and/or being "speculative" in nature. (Tr. 561–53.) But both Bowman and O'Dell did point to objective evidence to support their opinions. For example, O'Dell explained that her opinion about absenteeism was based partly on the fact that Rosario missed appointments due to frequent "bad days." (Tr. 1077.) Bowman explained that her opinion on absenteeism was based on her own observations that Rosario would "detach" multiple times within a forty-five-minute session, and that this observed inability to stay "present in mind" affects management of his schedule. (Tr. 1220.) To support her opinion on marginal adjustment, Bowman explained that she had observed Rosario's depersonalization experiences increase with environmental stressors (Tr. 1033) and that she had observed Rosario miss appointments if there was a change in the appointment time (Tr. 1223). In a section of a questionnaire asking for clinical findings, Bowman reported that Rosario's mood appeared to change from restless and talkative to depressed and fatigued. (Tr. 512.) This is sound evidence from the providers' own past experiences with Rosario that the ALJ failed to acknowledge.

As for self-reporting, for some mental health symptoms, one wonders what the alternative methods of evaluation would be. What type of objective examination or clinical

evidence would satisfy the ALJ that Rosario hears voices? Or that he often stays up all night pacing and talking to himself? *See Worzalla v. Barnhart*, 311 F. Supp. 2d 782, 797 (E.D. Wis. 2004) ("How else is a psychologist to evaluate a patient's mental illness, other than talking to him? Depression does not show on an x-ray."). Both Bowman and O'Dell are mental health professionals who presumably scrutinize patient statements before accepting or relying on them. *Id.*; *see also Cole v. Colvin*, 831 F.3d 411, 415–16 (7th Cir. 2016) (ALJ improperly gave no weight to physician's opinion based on patient's self-reporting when objective test did not exist); *Carradine*, 360 F.3d at 755 (finding it improbable that claimant was "a good enough actress" to fool a host of medical professionals about the severity of her pain); *Brown v. Barnhart*, 298 F. Supp. 2d 773, 792–93 (E.D. Wis. 2004) ("While the Commissioner is correct that much of this evidence consists of or is based upon plaintiff's subjective complaints . . . , the ALJ was not allowed to ignore it. Physicians are entitled to rely on their patients' descriptions of their condition."); *Samuel v. Barnhart*, 295 F. Supp. 2d 926, 950 (E.D. Wis. 2003) (patient's report of complaints is "an essential diagnostic tool").

In sum, the ALJ erred in rejecting the opinions of Rosario's providers on the basis that they were based on subjective, rather than objective, evidence.

### 1.3.4.    *Response to Medication*

The ALJ also erred in discounting Rosario's treating providers' opinions on the basis of Rosario's response to medication. In explaining his decision to discount Bowman's opinions, the ALJ stated that "the medical evidence stated that the claimant's mood was stable when he followed the medication regimen." (Tr. 562 (citing Tr. 1061, 1067).) But the ALJ cited two 2016 treatment notes from O'Dell that cannot plausibly be read as saying that Rosario's mood was stable. At most, they document a *relatively* good stretch in which

Rosario's mood was *more* stable than it had been previously. (Tr. 1061 ("Patient mood is stable at this time."), 1067 ("Mood is more stable but still fluctuating.").) In the May 2016 note in which O'Dell noted that Rosario's mood was "more stable but still fluctuating," Rosario had reported that he was "relatively stable," "[n]one of the symptoms have stopped," and "[m]ood swings occur still but are less severe." (Tr. 1066–67.) In the November 2016 note in which O'Dell noted that Rosario's "mood is stable at this time," Rosario also reported that his mood was "relatively well, better than last week." (Tr. 1060–61.) These records do not document a mood that is stable on medication, but an unstable mood that is *more* stable on medication.

Furthermore, even if the notes did indicate that Rosario's mood was stable, that alone would not justify discrediting allegations of disabling symptoms. *Murphy v. Colvin*, 759 F.3d 811, 818–19 (7th Cir. 2014) ("Simply because one is characterized as 'stable' or 'improving' does not mean that [one] is capable of [ ] work"); *Scott*, 647 F.3d at 739–40 (responding well to treatment not adequate reason to discount assessment of marked limitations and absenteeism); *see also Johnson v. Colvin*, No. 15 C 9737, 2017 WL 219514, at *5 (N.D. Ill. Jan. 19, 2017) (in order to use response to treatment as a basis for discounting symptoms, "the ALJ must connect how his improvement restored Plaintiff's ability to work"); *Salazar v. Colvin*, No. 13 C 9230, 2015 WL 6165142, at *4 (N.D. Ill. Oct. 20, 2015) (functional limitations may remain even after improvement). Thus, the ALJ improperly relied on Rosario's response to medication to discount the opinions of his treating providers.

### 2. *Subjective Complaints*

Rosario argues that the ALJ improperly discounted his reports of disabling symptoms as inconsistent with the medical evidence and other evidence in the record, and improperly

"played doctor" by discounting his statements based on his lack of inpatient treatment. (Docket # 12 at 22–27.) I agree.

### 2.1. Legal Standard

The Commissioner's regulations set forth a two-step test for evaluating a claimant's statements regarding his symptoms. First, the ALJ must determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p. Second, if the claimant has such an impairment, the ALJ must evaluate the intensity and persistence of the symptoms to determine the extent to which they limit the claimant's ability to work. *Id.* If the statements are not substantiated by objective medical evidence, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms based on the entire record and considering a variety of factors, including the claimant's daily activities; the location, duration, frequency, and intensity of the symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes; treatment, other than medication, used for relief of the symptoms; other measures the claimant uses to relieve the symptoms; and any other factors concerning the claimant's functional limitations due to the symptoms. *Id.*

A court's review of a credibility, or consistency, determination is "extremely deferential." *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013). On judicial review, courts "merely examine whether the ALJ's determination was reasoned and supported." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (citing *Jens v. Barnhart*, 347 F.3d 209, 213–14 (7th Cir. 2003)). "It is only when the ALJ's determination lacks any explanation or support that

we will declare it to be patently wrong . . . and deserving of reversal." *Id.* at 413–14 (internal quotation marks and citations omitted).

### 2.2. Evidence

At the hearing on November 17, 2017, Rosario testified that he has discrete periods of mania and depression. (Tr. 621.) During manic periods, he feels anxious and scans constantly, feeling "like there's a well of energy in my chest" and he has to go somewhere and do something. (*Id.*) During these episodes, he sleeps little if at all. (Tr. 622.) He explained that if there is no particular trigger, a "bad period" will last for a couple of hours or overnight, but if there is some antagonizing factor a "bad period" can last for several days. (Tr. 599–600.) During a "bad period," he is unable to sleep, is physically sick, argues with himself, is extremely forgetful, and is extremely irritable. (Tr. 600.) Triggers can include stressful events, including family conflict and hearing negative voices in his head. (Tr. 600–04.) During depressive episodes—the "crash"—he feels like dying, his world is over, and he "might as well just let it go." (*Id.*) Rosario stated that medication makes his extremes less common and less severe, giving him "a larger in the middle section where [he] can function." (Tr. 599, 606.) He stated that without medication, he has a "bad period" several times a week depending on triggers, but with medication it is about once a week. (*Id.*) Rosario testified that he has auditory and visual hallucinations daily. (Tr. 600–04, 611.) Rosario testified that sleep problems related to bipolar disorder can make him very fatigued during the day. (Tr. 608.)

Rosario stated that medication makes his extremes less common and less severe, giving him "a larger in the middle section where [he] can function." (Tr. 599, 606.) He stated that without medication, he has a "bad period" several times a week depending on triggers, but with medication it is about once a week. (*Id.*) With medication, he recognizes that his

hallucinations are not real. (Tr. 612.) He testified that he has a CPAP machine that improves the quality of his sleep, but not the quantity. (Tr. 608–09.)

Rosario reported that he lives in a detached garage at his mother's house. (Tr. 584.) He testified that he does not leave home except for doctor's appointments and other medical needs every Tuesday and Thursday, and grocery shopping on the 15th of every month. (Tr. 590–91.) He does not drive and takes public transportation. (Tr. 589–90.) Rosario testified that he has memory problems, cannot keep a schedule or keep track of things, and can be very argumentative. (Tr. 596, 606.) Despite his problems, he can take the bus and handle his own money; however, he testified that he must be supervised when shopping to be told if he is forgetting something or getting too much of something. (Tr. 607.) He explained that socializing is difficult for him because he does not trust himself to interact with people. (Tr. 620.) He testified that in the past he has had physical and verbal altercations with people, for example over a store clerk asking to see his identification. (Tr. 622–24.) Now, he does not have such altercations because he isolates himself and, when he has to leave the house, he always wears headphones to "drown out everything." (Tr. 625.) He explained that he can be pleasant and engaging with therapists, other medical providers, and the ALJ because he does not feel threatened. (Tr. 620.)

Rosario described several past short-term jobs, but could not remember whether he had worked since the alleged date of disability onset. (Tr. 595–96.) He explained that his jobs have all ended because he has not been able to provide consistent quality due to episodes of forgetfulness and inability to follow instructions/patterns. (Tr. 620–21.) At one point he walked off a job because he mistakenly thought his shift was done. (Tr. 621.) He also testified that coworkers would ask who he was talking to or why he was laughing. (Tr. 621.)

In his Adult Function Report of March 3, 2017 (Tr. 909–17), Rosario indicated that he cannot stay on task, is hard to work with, needs constant oversight, and has wild mood swings (Tr. 909). He stated that he spends his days pacing back and forth and talking to himself. (Tr. 910.) The only caregiving activity he engages in is helping to feed cats. (*Id.*) He stated that he cannot sleep well without a medical device, and sleeps three hours a night. (Tr. 910, 917.) He stated that he can dress and feed himself and toilet independently, but he forgets to bathe, care for his hair, and shave. (*Id.*) He needs reminders to take medication. (Tr. 911.) He can only prepare basic meals. (*Id.*) The only household chore he engages in is taking the garbage out, and he goes off task when doing household chores. (*Id.*) He stated that he does not go outside, but when he does, he uses public transportation. (Tr. 912.) It sometimes takes him hours to do his shopping. (*Id.*) He is not able to handle a savings account because he forgets how much he has. (*Id.*) He does not spend time with others, does not regularly leave the house, needs to be reminded of doctor appointments, and needs someone to accompany him. (*Id.*) He has problems getting along with others because he is "hard to be around." (*Id.*) He checked boxes indicating that he has trouble with walking, talking, memory, completing tasks, concentration, understanding, following instructions, using his hands, and getting along with others. (Tr. 914.) He stated that he cannot pay attention and does not finish what he starts. (*Id.*) His ability to follow written instructions depends upon whether he can recall them, and he can follow spoken instructions if reminded. (*Id.*) His ability to handle stress depends upon his mood, and he has no ability to handle changes in his routine. (Tr. 915.) He talks to people when he is alone. (*Id.*)

### 2.3. ALJ's Consistency Determination

The ALJ found Rosario's statements about the intensity, persistence, and limiting effects of his symptoms inconsistent with the evidence because "he usually exhibited adequate mental function during appointments and mental status evaluations" and "[h]e received outpatient treatment, as opposed to inpatient care, for his impairments during the period at issue." (Tr. 557.)

The ALJ cannot plausibly state that Rosario "usually exhibited adequate mental function during appointments." The ALJ's decision itself acknowledges that alongside providers' observations of normal functioning were observations of poor hygiene, soiled clothes, disheveled appearance, body odor, low mood, concerned affect, repetition, depression, hopelessness, distraction, detachment, changed affect and eye contact, and moving his mouth as though speaking to someone who was not there. (Tr. 554–55.) *See Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013) (ALJ cherry-picked a handful of decontextualized statements from medical records to conclude that claimant's mental health was "essentially normal and intact," when notes also showed serious mental health issues). The ALJ's decision also failed to acknowledge treatment notes supporting some of Rosario's other complaints, including the many notes indicating that Rosario appeared fatigued; at appointments with Bowman he often yawned, lied down on the sofa, and even once fell asleep. (Tr. 486.) Furthermore, as with the treating providers' opinions, even if the ALJ had built a logical bridge between the treatment records and his conclusion that Rosario generally functioned adequately at appointments, the ALJ failed to explain how Rosario's presentation during appointments or brief consultative exams was inconsistent with disabling symptoms of bipolar disorder. (Tr. 554–55.)

Additionally, the ALJ impermissibly "played doctor" by discounting Rosario's symptoms because Rosario received outpatient treatment as opposed to inpatient care. There is no record of Rosario being referred for inpatient treatment or any medical opinion that someone with Rosario's alleged symptoms would have needed inpatient treatment. *See Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009) (ALJ improperly inferred that claimant was not experiencing significant problems because doctors had not prescribed certain treatment); *Greggs v. Berryhill*, No. 17 C 0671, 2018 WL 3417007, at *4 (N.D. Ill. July 13, 2018) ("An ALJ cannot assume that symptoms or mental limitations are less serious based solely on his or her lay opinion as to the treatment given."); *Pratt v. Colvin*, No. 12 C 8983, 2014 WL 1612857, at *7 (N.D. Ill. Apr. 16, 2014) (improper to discount claimant's credibility based on a lack of an attempt to seek certain treatment where there is no evidence that such treatment was recommended or would have been effective).

For these reasons, the ALJ's discounting of Rosario's reported symptoms is patently wrong and must be reversed.

### 3.    RFC Determination

Finally, the ALJ failed to appropriately evaluate Rosario's ability to work on a regular and continuing basis, as required by SSR 96-8p:

> In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

*See also Bauer*, 532 F.3d at 609 (claimant with bipolar disorder "is likely to have better days and worse days," and even if "half the time she is well enough that she could work," this

particular claimant still "could not hold down a full-time job"); *Hunt v. Astrue*, 889 F. Supp. 2d 1129, 1145 (E.D. Wis. 2012) (for claimant with bipolar disorder, "the ALJ did not meaningfully consider whether plaintiff's condition was such that, even if she faithfully took her pills, she would be unable to work on a regular and sustained basis.").

Here, the RFC discussion fails to account for significant evidence in the record that Rosario would not be able to work full-time on a consistent basis due to symptoms of his bipolar disorder. Treatment notes indicate that Rosario missed over a dozen medical or therapy appointments due to erratic sleep and episodic mental health symptoms. (Tr. 988, 1030, 1077, 1219, 1429, 1435, 1553, 1561, 1565, 1585, 1589, 1606, 1659, 1692.) Rosario testified that, even on medication, he has weekly episodes of mania in which he cannot sleep, followed by a "crash" characterized by depression and fatigue. (Tr. 599–609, 621–22.) His treating providers opined to high rates of absenteeism due to these, and possibly other, mental health issues. (Tr. 515, 1027, 1031, 1077, 1220, 1739.) In light of this evidence, it was reversible error for the ALJ to fail to address Rosario's ability to sustain full-time work on a consistent basis.

### 4. Remedy

Ordinarily, the appropriate remedy is to remand to the agency for further proceedings. *See Worzalla*, 311 F. Supp. 2d at 800–01. It is the agency's role, not the court's, to weigh the evidence, resolve conflicts, and determine whether the claimant is disabled. *Id.* A reviewing court may remand with instructions for an award of benefits only where (1) the record overwhelmingly supports a finding of disability and (2) the delay involved in repeated remands has become unconscionable or the agency has displayed obduracy in complying with the law. *Id.* (citing *Gotz v. Barnhart*, 207 F. Supp. 2d 886, 901–03 (E.D. Wis. 2002)); *see also*

*Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345 (7th Cir. 2005) (award of benefits appropriate when record demonstrates disability and agency demonstrates obduracy).

There is abundant—perhaps overwhelming—evidence that Rosario's mental impairments were disabling during the period at issue. However, I cannot say that repeated remands have become unconscionable or the agency has displayed obduracy in complying with the law. The first remand was stipulated; Judge Jones did not comment on the merits of Rosario's case. This is the first federal court to opine on the merits. Therefore, remand for further proceedings in light of this opinion is the appropriate remedy. However, given that this claim has been pending since 2012 and there is a reasonable likelihood that the agency will find that Rosario is entitled to benefits when the evidence is properly construed, the agency should apply the most expedited process available.

## CONCLUSION

The ALJ rightly concluded that Rosario can function well at times; he appears to have many strengths, despite his challenges. But this does not mean he can work full-time. The ALJ's decision is reversed and the case remanded for further proceedings consistent with this decision pursuant to 42 U.S.C. § 405(g), sentence four, on the most expedited basis possible.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the Commissioner's decision is **REVERSED**, and the case is **REMANDED** for expedited proceedings consistent with this decision pursuant to 42 U.S.C. § 405(g), sentence four.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 22ⁿᵈ day of August, 2019.

BY THE COURT

_s/Nancy Joseph_
NANCY JOSEPH
United States Magistrate Judge